# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

APRIL MERCHANT and
DORIS MERCHANT,

|  |  |
|---|---|
| Plaintiffs, | |
| v. | Civil Case No.: 1:20-CV-00569-LM |

FEDERAL HOME LOAN MORTGAGE
CORPORATION, and

NEWREZ, LLC d/b/a SHELLPOINT
MORTGAGE SERVIVING, and

CYPREXX SERVICES, LLC

Defendants.

---

## DECLARATION OF CRAIG MCMAHON IN SUPPORT OF PLAINTIFF'S MOTION
## FOR LEAVE TO FILE AMENDED COMPLAINT

I, Craig McMahon, having been duly sworn, hereby depose and say:

1.      I make this oath on personal knowledge.  I am an associate in the law firm of Rath, Young, and Pignatelli, P.C., counsel to the Plaintiffs April and Doris Merchant in the above-captioned matter.

2.      This affidavit is in support of the Plaintiffs' Motion for Leave to File Amended Complain (the "Motion").

3.      I affirm that the facts asserted within that motion are true and accurate to the best of my knowledge and belief, under the pains and penalties of perjury.

4.      Attached hereto as **Exhibit A** is a true and correct copy of the Plaintiffs' Proposed First Amended Complaint.

5.      I confirmed the dates on which Plaintiffs' prior counsel served discovery requests on Cyprexx and received Cyprexx's response to same via reference to the litigation file I received from prior counsel after Plaintiffs retained my firm in this case.  Plaintiffs' initial discovery request is signed and dated January 28, 2021, and the cover letter to Cyprexx's response from Cyprexx's counsel is dated April 1, 2021.

6.      I confirmed the dates on which Plaintiffs' prior counsel served discovery requests on Shellpoint and received Shellpoint's response to same via reference to the litigation file I received from prior counsel after Plaintiffs retained my firm in this case.  Plaintiffs' initial discovery request is signed and dated January 29, 2021, and the certificate of service in Shellpoint's response, signed by Shellpoint's counsel, is dated March 12, 2021.

7.      I confirmed the dates on which Plaintiffs' prior counsel served discovery requests on Freddie Mac and received Freddie Mac's response to same via reference to the litigation file I received from prior counsel after Plaintiffs retained my firm in this case.  Plaintiffs' initial discovery request is signed and dated January 29, 2021, and the certificate of service in Freddie Mac's response, signed by Freddie Mac's counsel, is dated March 11, 2021.


                                          /s/ Craig McMahon
                                          Craig T. McMahon (NH Bar No. 272941)
                                          Rath, Young and Pignatelli, PC
                                          One Capital Plaza
                                          Concord, New Hampshire 03302
                                          (603) 226-2600
Dated: August _27__, 2021                 ctm@rathlaw.com

2

I hereby certify that on August 27, 2021, before me personally appeared Craig T. McMahon and swore that the foregoing statements are true and correct to the best of his knowledge, information and belief, under pains and penalties of perjury.

_____
Notary Public
My Commission Expires:

**FAITH A. MCEVOY**
NOTARY PUBLIC
State of New Hampshire
My Commission Expires
November 25, 2024

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| APRIL MERCHANT and<br>DORIS MERCHANT,<br><br>                              Plaintiffs,<br><br>   v.<br><br>FEDERAL HOME LOAN MORTGAGE<br>CORPORATION, and<br><br>NEWREZ, LLC d/b/a SHELLPOINT<br>MORTGAGE SERVICING, and<br><br>CYPREXX SERVICES, LLC<br><br>                         Defendants. | Civil Case No. 1:20-CV-00569-LM |

### <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs April and Doris Merchant ("April" and "Doris," respectively, and "Plaintiffs" collectively), by and through their undersigned counsel, Rath Young and Pignatelli, P.C., file this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).  By this Complaint, Plaintiffs seek monetary damages and declaratory relief resulting from actions taken by Defendants Federal Home Loan Mortgage Corporation ("Freddie Mac"), NewRez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), and Cyprexx Services, LLC ("Cyprexx") in breach of duties arising out of tort and contract law.  In support of its requests for relief, Plaintiffs state as follows:

1.      This action arises out of Freddie Mac's and Shellpoint's breach of their respective contractual obligations to Plaintiff pursuant to a certain mortgage given by Plaintiffs to Freddie Mac and serviced on Freddie Mac's behalf by Shellpoint.  Among other things, Freddie Mac and

Shellpoint caused Cyprexx or its agents to unlawfully enter onto Plaintiffs' property and cause damage, destruction, and loss of Plaintiffs' real and personal property.

2.     While Plaintiffs were in consistent contact with Shellpoint respecting a potential loss mitigation or forbearance plan respecting Plaintiffs' property securing the Freddie Mac's mortgage (as further defined below, the "Property"), Shellpoint and Freddie Mac took actions seeking to recover debt owed by Plaintiffs, which actions were directly inconsistent with the representations Shellpoint and Freddie Mac made to Plaintiffs.

3.     Among other things, Defendants, by and through their authorized representatives, entered the Property without April and Doris's knowledge and consent and caused hundreds of thousands of dollars of damage to both the Property itself and April and Doris's personal property located therein.  Defendants engaged in this course of conduct despite clear communication and indication that the Property was not vacant, including the fact that the beds were made, perishable food was in the refrigerator and cupboards, clothes were in the closet and drawers, and renovations were clearly in process within the Property.

4.     April and Doris diligently tried to resolve the issue, and repeatedly notified the Defendants or their authorized representatives that they were not to enter the Property without Plaintiffs' consent or prior notice.  Defendants, by and through their authorized representatives, persisted in repeatedly changing the locks to the Property and insisting, contrary to all evidence, that the Property was vacant.

5.     Defendants initiated foreclosure proceedings on the Property and scheduled a foreclosure sale, forcing April to file for bankruptcy protection to maintain her interest in the Property.

6.      As a result of Defendants' actions, including those that required April to file bankruptcy, April has lost lucrative job opportunities and has been limited in her legal career.

7.      As a result of the attendant stress unnecessarily thrust upon her by Defendants, Doris has suffered from cardiac events that have left her hospitalized.

8.      Plaintiffs seek monetary damages against Defendant Freddie Mac because, at all times relevant to this Complaint, Freddie Mac was Plaintiffs' mortgagee, and was responsible for its and its agents' compliance with the terms of the Mortgage (defined below).

9.      Plaintiffs seek and monetary damages against Defendant Shellpoint because, at all times relevant to the Complaint, Shellpoint serviced the Mortgage and was responsible for causing its authorized representatives or agents to enter onto the Property without prior notice or consent of April and Doris, in violation of the Mortgage, and causing hundreds of thousands of dollars of damage to April and Doris and their property.

10.     Plaintiffs seek monetary damages against Cyprexx because Cyprexx, by and through its authorized representatives or agents, entered onto the Property without Plaintiffs' prior knowledge or consent, destroyed Plaintiffs' personal property, including irreplaceable family heirlooms and antiques, and changed the locks to the Property, preventing Plaintiffs from accessing their own home.

11.     Upon reasonable inference, information, and belief, Defendants' inexplicable actions were an attempt to intimidate, harass, and otherwise pressure Plaintiffs in an attempt to secure repayment of Plaintiffs' debt secured by the Property, through Plaintiffs' abandonment of the Property, foreclosure, or otherwise.

**PARTIES**

12.     At the time the complaint initiating this case was filed, April Merchant was a New Hampshire citizen residing at 36 Midridge Circle, Londonderry, NH 03053.  April Merchant now resides at 6 Vista Way, Bloomfield Connecticut, 06002 and maintains ownership of the Property in New Hampshire.

13.     At the time the complaint initiating this case was filed, Doris Merchant, April Merchant's mother, was New Hampshire citizen residing at 36 Midridge Circle, Londonderry, NH 03053.  Doris Merchant now resides at 6 Vista Way, Bloomfield Connecticut, 06002 and maintains ownership of the Property in New Hampshire.

14.     April and Doris own the property located at 1 Valley of Industry, Boscawen, New Hampshire 03303 (the "Property").

15.     Defendant Freddie Mac is a public government-sponsored enterprise with a principal business address of 8200 Jones Branch Drive, McLean, VA 22102-3110, which at all times relevant to this lawsuit held a mortgage given by Plaintiffs (the "Mortgage") on the Property.

16.     Defendant Shellpoint is a Delaware limited liability company with a principal place of business at 1100 Virginia Dr. Suite 125, Fort Washington, PA 19034.

17.     Defendant Cyprexx is a Delaware limited liability company with a principal place of business at 525 Grand Regency Blvd., Brandon, FL 33510.

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction over this case pursuant to 28 USC § 1332 because there is a justiciable controversy between the parties, who are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendants by virtue of their respective contacts with New Hampshire which directly relate to the causes of action and factual support pled by Plaintiffs in this Complaint.

20.     Venue is proper in this district pursuant to 28 USC § 1391(b) because the events or omissions giving rise to the Plaintiffs' claims substantially occurred in New Hampshire.

<strong>FACTS COMMON TO ALL COUNTS</strong>

21.     Plaintiffs hereby reallege and incorporate by reference the facts and allegations contained in the preceding paragraphs as if fully set forth therein.

**I.      The Mortgage and Plaintiffs' Ownership and Occupancy of the Property**

22.     In 1997, Doris and her late husband David Merchant, April's father, acquired the Property as a family home.

23.     In or around 1999, David Merchant fell gravely ill and accumulated hundreds of thousands of dollars in medical bills, ultimately passing away.

24.     In 2002, as part of an attempt to consolidate debt and pay her late husband's medical bills, Doris refinanced the mortgage on the Property.

25.     In 2004, April purchased an interest in the Property and Plaintiffs refinanced the mortgage on the Property.

26.     In 2011, April and Doris refinanced the mortgage Property again, granting the Mortgage that Freddie Mac now holds.

27.     At all times relevant to this Complaint, Shellpoint serviced the Mortgage on Freddie Mac's behalf.

28.     The Mortgage, dated on or about November 4, 2011, provides, among other things that "Lender or its agent may make reasonable entries upon and inspections of the

Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause."  *See* Mortgage, attached hereto as <u>Exhibit A</u>, ¶ 7.

29.     The Mortgage further provides that "securing the property includes, but is not limited to, entering the property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminating building or other code violations or dangerous conditions, and have utilities turned on or off." <u>Exhibit A</u>, ¶ 9.

30.     In late 2014, April enrolled at Suffolk University in Boston, Massachusetts, while working full time and attending classes four nights per week.

31.     In early 2015, April moved from the Property to Londonderry, NH in order to reduce the time spent commuting between home and school.  At all times relevant to this Complaint, April intended to return to and permanently reside at the Property.

32.     Doris lived in the Property until approximately October 2018, when she contracted a case of pneumonia and moved in with April so that April could take care of her as she recovered.

33.     Doris's doctor advised her that the old carpeting in the Property could be harming her health.  Accordingly, while Doris lived with April in Londonderry, Plaintiffs decided to replace the flooring at the Property.  April purchased a full pallet of new flooring to install at the Property, and those materials were present at the Property throughout the time period relevant to this Complaint.

34.     In the fall of 2018, April and Doris fully winterized the property by, among other things, turning off the water, leaving the heat at 50 degrees, leaving the electricity on, turning off the cable, and canceling any snow removal services at the property.

35.     April and Doris kept a trailer at the Property from the fall of 2018 through the spring of 2018 in anticipation of conducting the renovations and eventually moving back into the Property permanently.

36.     April visited the Property on a weekly basis during this time to continue to maintain and work on the Property.

37.     Plaintiffs were current on all payments due under the Mortgage through the end of 2018.

## II.    Plaintiffs' Communications with Defendants Respecting Mortgage Payments and Deferments and Defendants' Misrepresentations Respecting Same.

38.     In January of 2019, April lost her primary employment working as an immigration law paralegal.  At that time, April contacted Shellpoint to seek a forbearance or deferment of payments due under the Mortgage.

39.     Shellpoint told April that, due to the shutdown of the federal government at that time, and pursuant to the Federal Employee Civil Relief Act, Plaintiffs were entitled to a three-month deferment of payments due under the Mortgage.

40.     Shellpoint communicated to Plaintiffs in February of 2019 that the requested deferment/forbearance plan had been approved, and that the Plaintiffs' next payment, which would be the same monthly payment made prior to the forbearance period, would be due in at the end of April 2019.

41.     As the end of April 2019 approached, Plaintiffs maintained active contact with Shellpoint.  On or around April 12, 2019, Doris spoke with Shellpoint representatives and indicated that April had lost her job and Plaintiffs were looking for assistance respecting the upcoming payment and to enter into a repayment plan to reduce the monthly payments due.

42.     A few days later, Doris followed up with Shellpoint and indicated that Plaintiffs expected to be able to pay approximately $1500 at the end of April and monthly thereafter.

43.     On April 16, 2019, while the forbearance plan was still in effect and while considering Plaintiffs' repayment plan request, Shellpoint requested that Cyprexx enter, inspect, secure and provide a report respecting the Property.

44.     On or about April 18, 2019, Shellpoint contacted Plaintiffs and informed them the requested repayment plan of approximately $1500 per month had been approved.

45.     On or about April 23, 2019, Cyprexx entered the Property, changed the locks and posted signs at the Property indicating that it or certain of its representatives or agents acting on behalf of Cyprexx had been engaged to maintain and winterize the Property and that they had determined the Property to be vacant.

46.     None of the Defendants informed Plaintiffs that Cyprexx intended to inspect or enter the Property.

47.     None of the Defendants sought or received Plaintiffs' permission to enter the Property.

48.     By requesting and receiving a deferment in January of 2019, among other things, Plaintiffs clearly communicated to Shellpoint their intent to retain the Property through the temporary financial hardship they faced.

49.     Upon reasonable inference, information and belief, Freddie Mac and Shellpoint understood or reasonably should have understood at all relevant times that Plaintiffs intended to retain the Property.

50.     On or about April 26, 2019, April received an email from Shellpoint stating that Plaintiffs had been approved for a repayment plan and demanding that Plaintiffs "send [Shellpoint] your payment immediately!"

51.     April attempted to make an electronic payment of the $1500 approved payment using Shellpoint's web portal at this time, but was not allowed to do so and was instead instructed to call Shellpoint's Loss Prevention department.  Shellpoint informed April at this time that she owed just under $4000, and that Shellpoint would not accept a payment less than the full amount.

52.     Upon information and belief, the approximately $4000 Shellpoint demanded at this time included charges incurred as a result of Shellpoint's illegal and improper accessing and "securing" of the Property, through Cyprexx or other agents.

53.     On or about April 29, 2019, April contacted Shellpoint again regarding the upcoming payment and, during that discussion, was convinced by a Shellpoint representative to pursue a deed-in-lieu of foreclosure.  Shellpoint told Plaintiffs that a deed-in-lieu would result in a cash-out of the Plaintiffs' equity in the Property of approximately $100,000.

54.     On April 30, 2019, Plaintiffs submitted a hardship letter and borrower assistance form to Shellpoint, indicating that Plaintiffs intended to pursue a deed-in-lieu of foreclosure.

55.     Shellpoint indicated that "everything looked good" with respect to the borrower assistance form submitted.

56.     On May 15, 2019, April spoke to Shellpoint representatives and inquired as to the status of Plaintiffs' deed-in-lieu request, its attendant effect on Plaintiffs' payment obligations, and specifically told Shellpoint that Plaintiffs continued to maintain the Property in anticipation of returning to it.  Shellpoint informed April that the deed-in-lieu application was not complete

9

and that they were waiting on a title report respecting the Property.  April emailed the application to Shellpoint again.

57.     On or about May 17, 2019, Cyprexx, at Shellpoint's request, entered the Property for a second time.

58.     On or about May 26, 2019, after Cyprexx had twice entered the Property without the Plaintiffs' consent and without Plaintiffs receiving notice any Defendant or other third party, Plaintiffs discovered substantial damage to the Property.

59.     Cyprexx or its authorized representatives had caused food to be removed from the refrigerator and cupboards and left in trash bags, open and exposed.  Despite ostensibly acting to "secure" the Property, Cyprexx left windows and other access points to the home open and allowed rodents and insects, attracted by the food Cyprexx representatives left out, to enter and cause significant damage to the Property and Plaintiffs' personal property therein.  The damaged or lost items included family heirlooms and antiques which were priceless to the Plaintiffs and their family.

60.     Cyprexx or its authorized representatives changed the locks on the Property and did not provide a key to the Plaintiffs, constructively evicting Plaintiffs from their home.

61.     Cyprexx or its authorized representatives removed various electronics, kitchen appliances, and other personal items from the Property.

62.     Cyprexx or its authorized representatives left skylights in the Property's sunroom open, which caused further damage to the Property.

63.     After discovering the damage caused, the missing property, and the changed locks at the Property, Plaintiffs contracted Cyprexx and Shellpoint on or about May 27, 2019, and

informed them both that Plaintiffs had not abandoned the Property, that the property should not

be considered vacant, and instructed them not to enter the Property.

64.     Shellpoint told April that the entry into the property was a "mistake" and that they

had not requested that Cyprexx or anyone else enter or inspect the Property.

65.     On May 29, 2019, Alton Myers, identified as a "Property Preservation Specialist"

for Shellpoint sent an email to shellpoint@cyprexx.com, reporting that either April or Doris had

advised Shellpoint that the Property was not vacant, and requesting that Cyprexx "do drive by

inspections only until further notice. . . ."

66.     On the same day, Cyprexx Property Preservation Manager Dana Mangual sent an

email to one of its subcontractors, noting that the Property was occupied and cancelling a

requested winterization of the Property.

67.     Thus, at all times relevant to this Complaint, and as confirmed on May 29, 2019,

Defendants knew that Plaintiffs had not abandoned the Property or left the property "vacant" and

instead had been maintaining and intended to retain the Property.

68.     On June 5, 2019, April spoke to Shellpoint representatives and inquired as to the

status of the deed-in-lieu application.  Shellpoint told April that the application was being

reviewed and that the Property was not flagged for foreclosure.

69.     On June 21, 2019, Shellpoint notified Plaintiffs that the deed-in-lieu application

could not be approved due to exceptions on the title of the Property.

70.     At this time, April attempted to make a payment to Shellpoint in the amount of

approximately $7,140 which April believed to be valid, overdue charges under the Mortgage.

Shellpoint refused to accept this payment and refused to accept anything less than $13,130.38,

which included approximately $790 in fees for Cyprexx "securing" the home, which Shellpoint had previously said they did not order and was a "mistake."

71.     On July 1, 2019, Plaintiffs communicated with Shellpoint and indicated that they intended to clear the title of the Property and proceed with a deed-in-lieu.

72.     On or around July 12, 2019, Shellpoint sent a notice to Plaintiff stating that the loan was in default and that Shellpoint had been instructed to commence foreclosure proceedings.

73.     On July 15, 2019, April spoke with Shellpoint and Shellpoint assured April that no foreclosure date had been set and the Property was instead on "hold."

74.     On or around July 15, 2019, Shellpoint sent a Notice of Acceleration to Plaintiffs, noting that Shellpoint had instructed counsel to commence foreclosure of the Property.

75.     On July 19, 2019, April contacted Shellpoint to inquire as to the notices received and the status of the deed-in-lieu process and Shellpoint stated that it had no record that the deed-in-lieu application was still open, despite Plaintiffs' previous communications that it intended to continue with that process.

76.     Throughout this time, in all their contacts with Shellpoint, Plaintiffs never indicated that the Property was vacant or gave their permission to Shellpoint or Cyprexx to enter or inspect the Property.

77.     In fact, on or about July 19, 2019, Cyprexx contacted April to ask whether the Property was vacant and stated that Cyprexx had received notice that it was.  April assured Cyprexx that the Property was not vacant and contacted Shellpoint, which again denied that it ordered Cyprexx to inspect the Property or that it told Cyprexx the Property was vacant.

78.     On or about July 19, 2019, Shellpoint sent an email to Cyprexx stating that the Plaintiffs live on the Property and to please do drive-by inspections only until further notice.

79.     On September 19 and 24, 2019, Cyprexx or its representatives again entered the Property without prior notice to, or permission from, the Plaintiffs.  Cyprexx again posted notice at the Property indicating that it had determined the Property to be vacant.  Cyprexx again changed the locks at the Property.

80.     Upon information and belief, Shellpoint directed Cyprexx's entry into the Property in September of 2019, despite the fact that Plaintiffs had repeatedly directed Shellpoint and Cyprexx to cease entering the Property, and despite the fact that Shellpoint had repeatedly directed Cyprexx to limit its inspections to drive-bys.

81.     Following these September visits, Plaintiffs notified Cyprexx and Shellpoint, again, that the Property had not been abandoned and instructed both to stay off the Property.

82.     On or around October 4, 2019, Shellpoint provided Plaintiffs with notice of an intended foreclosure sale of the Property, to be completed on December 2, 2019.

83.     On October 15, 2019, April contacted Shellpoint and inquired as to the deed-in-lieu process once more.  April was told, for the first time, that the foreclosure date was set and no updated deed-in-lieu application (with title exceptions remedied) would be considered.

84.     On November 19, 2019, Cyprexx again entered the Property and determined it to be vacant, changing the locks yet again.

85.     Following Cyprexx's November entry, Plaintiffs again winterized the Property.

86.     On November 27, 2019, April filed for a voluntary petition under Chapter 13 of the United States Bankruptcy Code.  In her proposed Chapter 13 Plan, she noted her intent to retain the Property and pay any arrears through her Plan.

87.     On December 2, 2019, Shellpoint cancelled the foreclosure sale of the Property.

88.     Despite knowing that she intended to keep the Property, Freddie Mac and/or Shellpoint again instructed Cyprexx to inspect the Property during the end of winter or early spring of 2020 without any notice to Plaintiffs and without obtaining their permission.

89.     Cyprexx again entered the Property in 2020 and again posted a notice at the Property to the effect that it determined the Property to be vacant, and again changed certain of the Property's locks.

90.     Cyprexx again improperly secured the Property, resulting in additional damage to the Property and the Plaintiffs' personal property, which Plaintiffs discovered in March of 2020.

## IV.     Defendants' Further Violations of Applicable Law

91.     On June 5, 2019, pursuant to 12 U.S.C. § 2605(e)(1)(A) and Reg. X § 3500.21(e)(1), April and Doris sent a Qualified Written Request ("QWR") to Shellpoint seeking information pertaining to the servicing of the loan.

92.     Shellpoint received the QWR on June 11, 2019.

93.     Shellpoint responded to April and Doris on June 18, 2019, representing that it was "working to gather the requested information" and that it would forward the requested information as soon as possible.

94.     April and Doris never heard further regarding the status of this still-pending QWR until counsel for Shellpoint provided a copy of Shellpoint's response to the QWR, purportedly dated June 21, 2019, to April and Doris in connection with this litigation.

95.     Despite having breached the terms of the Mortgage, Freddie Mac and Shellpoint, as represented in continued communications to Plaintiffs, apparently intend to move forward with a foreclosure of the Mortgage and sale of the Property.

## CAUSES OF ACTION

96.     For all counts that follow, April and Doris hereby reallege and incorporate by reference the facts and allegations contained in the preceding paragraphs as if fully set forth therein.

### COUNT I
### Breach of Contract – Against Freddie Mac and Shellpoint

97.     April and Doris, as mortgagors, and Freddie Mac, as mortgagee, are parties to a valid and enforceable written mortgage as more fully set forth above.

98.     Shellpoint, as servicer of the Mortgage, is likewise bound by its terms and conditions and required to honor Freddie Mac's obligations and responsibilities thereunder.

99.     Freddie Mac and Shellpoint's breaches of the Mortgage include, but are not limited to the following acts and omissions.

100.    Without excuse, Freddie Mac and Shellpoint breached Paragraph 7 of the Mortgage by causing Cyprexx or authorized representatives thereof to enter and inspect the interior of the improvements on the Property absent any reasonable cause.

101.    Without excuse, Freddie Mac and Shellpoint further breached Paragraph 7 of the Mortgage by failing to provide effective notice to April and Doris that they intended to make an interior inspection of the improvements on the Property.

102.    Without excuse, Freddie Mac and Shellpoint breached Paragraph 9 of the Mortgage by entering the Property, changing the locks, and otherwise taking action to ostensibly secure the Property where none of the three conditions allowing them to do so existed and where, instead:

       a.  April and Doris had complied with the covenants and agreements contained in the Mortgage;

15

b. During the initial entries on and damages to the Property and personal property of April and Doris, there was no legal proceeding that could affect Freddie Mac's interest in the Property; and

c. April and Doris had not abandoned the Property, and Defendants knew or should have known that Plaintiffs had not abandoned the Property.

103. Without excuse, Freddie Mac and Shellpoint further breached Paragraph 9 of the Mortgage by taking action that was neither reasonable nor appropriate to protect Freddie Mac's interest in the Property.

104. As a direct and proximate result of Defendants' breaches, April and Doris have suffered damages, including but not limited to diminution of the Property's value, the loss of the use and enjoyment of the Property, and the loss of or damage to various personal possessions and other chattels located within the Property.

**COUNT II**
**Trespass to Land – Against Cyprexx**

105. Under the common law of New Hampshire, a trespass occurs where there is an intentional invasion of the real property of another, resulting in harm to the landowner.

106. Cyprexx or authorized representatives thereof willfully entered the home situated on the Property without Plaintiffs' permission.

107. Upon doing so, Cyprexx or authorized representatives thereof caused damage to the home itself, lowering the value of the Property and causing legally-cognizable harm to April and Doris.

108. Cyprexx further changed the locks to the home situated on the Property multiple times, thereby depriving April and Doris of their possessory interest therein during multiple periods of time in 2019 and 2020.

109.     Cyprexx's actions were intentional, as evidenced by their insistence on repeating those actions following receipt of repeated writings from Plaintiffs demanding that Cyprexx cease entering the Property without Plaintiffs' express, prior consent.

110.     As a proximate result of Cyprexx's trespass, Plaintiffs have incurred damages as described in this Complaint, incurred attorneys' fees and costs in bringing this litigation, and they seek relief as set forth in the Prayer for Relief, *infra*.

## COUNT III
### Trespass to Chattels – Against Cyprexx

111.     Under the common law of New Hampshire, trespass to chattel occurs when a person interferes with the personal property of another and in doing so:

    a.  Impairs the condition, quality, or value of the chattel;

    b.  Deprives the possessor of the use of the chattel for a substantial time; or

    c.  Causes bodily harm is thereby caused to the possessor or some person or thing in which the possessor has a legally protected interest.

112.     When Cyprexx or authorized representatives thereof trespassed on the Property and entered the house, Cyprexx or authorized representatives thereof destroyed and damaged thousands of dollars' worth of April and Doris's personal property, including but not limited to clothing, furniture, electronics, and kitchen appliances.

113.     Without otherwise limiting the allegations in the foregoing paragraph, when Cyprexx or authorized representatives thereof trespassed on the Property, their unauthorized disposal of and damage to April and Doris's personal property within the home has also deprived April and Doris of the use of those chattels for a substantial time, including permanently, in certain cases.

114.    As a proximate result of Cyprexx's trespass, April and Doris have incurred damages as described in this Complaint, incurred attorneys' fees and costs in bringing this litigation, and they seek relief as set forth in the Prayer for Relief, *infra*.

## COUNT IV
### Violation of the Real Estate Settlement Procedures Act – Against Shellpoint

115.    The Real Estate Settlement Procedures Act, 12 U.S.C. § 2600 et seq. ("RESPA") was enacted to combat "unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a).

116.    Among other things, RESPA requires any servicer of a federally related mortgage loan to respond to a qualified written request ("QWR") for information related to the servicing of a loan within 30 days of receipt of the same.  12 U.S.C. § 2605(e).

117.    Whoever fails to comply with this requirement "shall be liable to the borrower" for each failure, which may include up to $2,000 in statutory damages if a court finds "a pattern or practice of noncompliance" with this requirement, as well as costs of the action, including reasonable attorneys' fees.  12 U.S.C. § 2605(f).

118.    At all times relevant to this Complaint, Shellpoint was the "servicer" of the Mortgage for the purposes of RESPA.

119.    April and Doris submitted a QWR to Shellpoint, but Shellpoint never provided this information until it produced a purported copy to April and Doris's prior counsel in connection with this action.

120.    Their belated and attempted compliance is ineffective, having not occurred until well outside the thirty-day window required by RESPA.

121.     As a proximate result of Shellpoint's failure to comply with RESPA, April and Doris have suffered actual damages, statutory damages, attorneys' fees, and costs, and they seek relief in the form more fully described in the Prayers for Relief, *infra*.

**COUNT V**
**Declaratory Judgment That Freddie Mac and Shellpoint Breached the Mortgage – Against Freddie Mac and Shellpoint**

122.     Plaintiffs and Freddie Mac are parties to a valid and enforceable written contract, the Mortgage, as more fully set forth above.

123.     As servicer of the Mortgage, Shellpoint is also bound to the terms and conditions contained therein.

124.     Freddie Mac breached the Mortgage by failing to ensure its servicer complied with the terms and conditions contained therein.

125.     Shellpoint breached the Mortgage by failing to effectively notify April and Doris of its inspections pursuant to Section 7 of the Mortgage.

126.     Shellpoint further breached the Mortgage by failing to take reasonable actions pursuant to Section 9 of the Mortgage, and by failing to make a determination that the Property was "abandoned."

127.     As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between Plaintiffs, Freddie Mac, and Shellpoint as to whether either Freddie Mac or Shellpoint has breached the Mortgage.

128.     April and Doris are entitled to a judgment declaring that Freddie Mac and/or Shellpoint have breached the Mortgage.

## COUNT VI
### Violation of the Fair Debt Collections Practices Act – Against Shellpoint

129.    The Fair Debt Collections Practices Act, 15 U.S.C. § 1692 et seq., ("FDCPA") was enacted to combat the "use of abusive, deceptive, and unfair debt collection practices by many debt collectors."

130.    Among other things, the FDCPA prohibits a debt collector from engaging in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.  15 U.SC. § 1692d.

131.    Among other things, the FDCPA prohibits a debt collector from using any false, deceptive, or misleading misrepresentation or means in connection with the collection of any debt.  15 U.S.C. § 1692e.

132.    The FDCPA imposes liability on debt collectors who violate its provisions in the amount of actual damages suffered as a consequence thereof, in addition to statutory damages not to exceed $1,000 per violation and reasonable costs and attorneys' fees in connection with bringing the matter.

133.    Shellpoint, as servicer for the Mortgage held by Freddie Mac, is a "debt collector" for the purposes of the FDCPA.

134.    In the course of servicing the Mortgage, Shellpoint, as described in this Complaint, engaged in conduct the natural consequence of which was to harass, oppress, or abuse April and Doris in connection with collecting monies owed to Freddie Mac pursuant to the Mortgage by, among other things, granting a temporary forbearance and subsequently soliciting and causing Cyprexx to dispossess April and Doris by changing the locks of the home located on the Property without notifying April and Doris or obtaining their consent to do so.

135.    In the course of servicing the Mortgage, Shellpoint, as described in this
Complaint, used false, deceptive, and misleading misrepresentations and means in connection
with collecting monies owed to Freddie Mac pursuant to the Mortgage by, among other things (i)
representing to April and/or Doris that Shellpoint had not authorized Cyprexx to enter onto the
Property or otherwise authorized Cyprexx to perform any services in connection with the
Property, when Shellpoint had in fact done so and (ii) by misleading Plaintiffs into believing that
a deed-in-lieu of foreclosure was in process when, in fact, Shellpoint had commenced
foreclosure proceedings on the Property.

136.    As a proximate result of Shellpoint's violation of the FDCPA, April and Doris
suffered actual damages and are entitled to an award of the same, in addition to being entitled to
statutory damages, costs, and attorneys' fees associated with bringing this action, and seek relief
in the form more fully described in the Prayer for Relief, *infra*.

**COUNT VII**
**Violation of the New Hampshire Unfair, Deceptive, or Unreasonable Collection Practices**
**Act – Against Shellpoint**

137.    The New Hampshire Unfair, Deceptive, or Unreasonable Collection Practices
Act, RSA 358-C, (the "NH Unfair Collections Act") prohibits anyone attempting to collect a
debt or from collecting a debt in an unfair, deceptive, or unreasonable manner.  RSA 358-C:2.

138.    The NH Unfair Collections Act imposes liability on a debt collector who violates
its provisions in the amount of $200 statutory damages, plus costs and reasonable attorneys' fees,
for each violation thereof.

139.    Shellpoint, as servicer for Freddie Mac's Mortgage on the Property, is a "debt
collector" for the purposes of the NH Unfair Collections Act.

140.    By misrepresenting to April and Doris that it had not authorized Cyprexx to enter onto and perform services on the Property when it had in fact done so, Shellpoint made a materially false representation or implication as to the character, extent or amount of the debt owed by April and Doris to Freddie Mac pursuant to the Mortgage, in violation of RSA 358-C:3, VII.

141.    By attempting to collect charges and expenses associated with Cyprexx's services rendered at the Property, while simultaneously denying that it had authorized any such services, Shellpoint violated RSA 358-C:3, X.

142.    As a proximate result of Shellpoint's violation of the NH Unfair Collections Act, April and Doris suffered actual damages and are entitled to an award of the same, in addition to being entitled to statutory damages, costs, and attorneys' fees associated with bringing this action, and seek relief in the form more fully described in the Prayer for Relief, *infra*.

**COUNT VIII**
**Violation of the New Hampshire Consumer Protection Act – Against Cyprexx**

143.    The New Hampshire Consumer Protection Act makes it unlawful for "any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." NH RSA § 358-A:2. The statute provides that "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper." *Id.* § 358-A:10. The statute also provides that a successful claimant may recover actual damages or statutory damages.

144.    Cyprexx is a person under the meaning of that term in the New Hampshire Consumer Protection Act, RSA § 358-A:1.

22

145.     Cyprexx has engaged in unfair and deceptive acts in violation of this chapter in the conduct of trade and commerce.  Such acts include, but are not limited to, repeatedly dispossessing Plaintiffs of their use and enjoyment of the Property for the unlawful means of coercing their abandonment of their home, despite being aware at all times of Plaintiffs' desire to retain the Property and exclude Cypress from the Property.

146.     Cyprexx's unfair methods of competition have occurred in New Hampshire and were done willfully and knowingly, and such unfair and deceptive acts in the conduct of trade constitute a violation of RSA § 358-A.

147.     Cyprexx's unfair method of competition has caused Plaintiffs actual and/or statutory damages, including but not limited to, attorneys' fees and costs, in amounts to be established at trial.

148.     Because Cyprexx's unfair method of competition was done willfully and knowingly, Plaintiffs are entitled to treble damages, statutory damages, and attorneys' fees pursuant to RSA § 358-A.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief from this Honorable Court:

A.     Award April and Doris damages against Freddie Mac, Shellpoint, and Cyprexx in an amount to be proven at trial, including without limitation their compensatory, liquidated, and statutory damages attributable to Defendants' acts and omissions as described herein;

B.     Enter a declaratory judgment finding Freddie Mac and Shellpoint in breach of the Mortgage;

C.     Award April and Doris pre- and post-judgment interest on all damages awarded;

D.     Award April and Doris their costs of bringing this suit;

E.      Award April and Doris reasonable and necessary attorneys' fees; and

F.      Award all other relief, at law or in equity, as the Court determines to be necessary and appropriate.

Respectfully submitted by:

**APRIL MERCHANT AND
DORIS MERCHANT**

By and through their attorneys:

RATH YOUNG AND PIGNATELLI,

PC /s/ *Craig McMahon*
Michael K. O'Neil (NH Bar No. 21198)
Craig T. McMahon (NH Bar No. 272941)
Rath, Young and Pignatelli, PC
One Capital Plaza
Concord, New Hampshire 03302
(603) 226-2600
mko@rathlaw.com
Dated: August _27__, 2021            ctm@rathlaw.com

## CERTIFICATE OF SERVICE

I, Craig McMahon, hereby certify that on this date I caused a copy of the foregoing document to be electronically filed with this Court which effectuated service of this document via this Court's CM/ECF system upon all parties registered to receive such notice in this case.

/s/ Craig McMahon

Dated: August _27_, 2021